## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RENEE F. WINKELJOHN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | Case No. CIV-20-110-F |
| ) | |
| ASSURITY LIFE INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

## <u>ORDER</u>

Defendant Assurity Life Insurance Company (Assurity) issued a life insurance policy in the face amount of $500,000 to Greg A. Winkeljohn. Two weeks later, Mr. Winkeljohn died. His widow, plaintiff Renee F. Winkeljohn, the named beneficiary, submitted a request for proceeds. Assurity, acting within the policy's contestability period, obtained Mr. Winkeljohn's medical records. After review of those records, Assurity notified Mrs. Winkeljohn that it was rescinding the policy based upon alleged misrepresentations on the life insurance application regarding her husband's health history. Mrs. Winkeljohn commenced this lawsuit, claiming breach of contract and bad faith.[1] Assurity has moved for summary judgment under Rule 56, Fed. R. Civ. P., on both of Mrs. Winkeljohn's claims. Doc. no. 34. Mrs. Winkeljohn has responded, opposing summary judgment. Doc. no. 39. Assurity has

---

[1] Mrs. Winkeljohn filed her action in the District Court in and for Oklahoma County, State of Oklahoma. Assurity timely removed the action to this court based upon the existence of diversity jurisdiction, 28 U.S.C. § 1332.

replied.  Doc. no. 42.  Upon due consideration of the parties' submissions, the court makes its determination.

## I.

### *Standard of Review*

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or part of each claim or defense—on which summary judgment is sought.  Rule 56(a), Fed. R. Civ. P. Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*.  In deciding whether summary judgment is appropriate, the court does not weigh the evidence and determine the truth of the matter asserted, but only determines whether there is a genuine issue of material fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.  A fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  *Id*.  In adjudicating a motion for summary judgment, the court views the evidence and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party.  McGehee v. Forest Oil Corporation, 908 F.3d 619, 624 (10th Cir. 2018).  Since this action is premised upon diversity jurisdiction, the court applies the substantive law of the forum state, and it is undisputed that, under the facts of this case, Oklahoma's substantive law controls the resolution of Mrs. Winkeljohn's claims. *See*, *e.g.*, Scottsdale Ins. Co. v. Tolliver, 636 F.3d 1273, 1277 (10th Cir. 2011).

## II.

### *Relevant Facts*

The following relevant facts are undisputed or viewed in a light most favorable to Mrs. Winkeljohn.

On April 2, 2014, Mr. Winkeljohn presented himself to Dr. Javier Barajas with Integris Family Physicians to establish primary care.  He complained of fatigue and decreased libido.  As part of his past medical history, Mr. Winkeljohn indicated he had an "Operation/Hospitalization/Injury" for sleep apnea in 2009.  Doc. no. 34-1, ECF p. 55.  He reported that he had never used his CPAP machine even though he was recommended to use it.  *Id*. at ECF p. 58.  Dr. Barajas's assessment of Mr. Winkeljohn included "Obstructive sleep apnea."  *Id*. at ECF p. 59.

Mr. Winkeljohn returned to Dr. Barajas for a follow-up visit on April 16, 2014.  According to the "Visit Summary," the use of CPAP machine was readdressed, and Dr. Barajas indicated that the "patient might need to caliber the machine."  Doc. no. 34-1, ECF pp. 36 & 40.

On December 14, 2014, Mr. Winkeljohn presented himself to Universal Men's Clinic as a new patient.  He was complaining of symptoms consistent with low testosterone.  Mr. Winkeljohn reported a past surgical history of sleep apnea, and he reported signs of sleep apnea including somnolence and snoring.  He also reported that his partner said his breathing would stop, and that he did not use a CPAP machine.  His blood pressure reading was 170/117.  As part of the treatment plan, the physician indicated that Mr. Winkeljohn was to check "his blood pressure when he was in no pain and relaxed at the pharmacy and bring them in for evaluation."  The physician reported that "no ICI (intracavernosal injection) can be prescribed until the blood pressure is under better control."  Mr. Winkeljohn was advised to make an appointment with his primary care physician to treat his hypertension.  He was prescribed Lisinopril (30-day quantity) to treat the hypertension.  The physician also recommended Mr. Winkeljohn to have a sleep study to evaluate for sleep apnea.  Doc. no. 34-2, ECF p. 4.

Approximately two months later, on February 13, 2015, Mr. Winkeljohn presented himself to Dr. Barajas for "bp high."  Dr. Barajas, in his diagnostic and

laboratory orders, indicated Mr. Winkeljohn's problem to be "Hypertension."  Doc. no. 34-1, ECF p. 13.[2]

On June 14, 2017, Mr. Winkeljohn presented himself as a new patient at Xpress Wellness Urgent Care, complaining of an earache.  He was seen by a physician assistant, Jesse Hart, who was supervised by Dr. Max Cates.  Mr. Winkeljohn reported a history of untreated hypertension with systolic blood pressure readings in the range of 150-160.  He had two blood pressure readings of 190/90 and 180/110.  He also reported a history of surgery to treat sleep apnea and that he still had some symptoms of disrupted sleep and not feeling fully rested.  Mr. Winkeljohn's "Assessment/Plan" included "Essential (primary) hypertension."  He was instructed to follow up in a week for fasting labs and to follow up in three weeks for blood pressure recheck.  He was prescribed Hydrochlorothiazide (30-day quantity) to treat his hypertension.  Mr. Winklejohn's "Assessment/Plan" also included a statement that the obstructive sleep apnea and sleep study would be discussed at the next visit.  Doc. no. 34-3, ECF pp. 1-3.

On September 25, 2017, Mr. Winkeljohn presented himself to Xpress Wellness Urgent Care because of a piece of wood stuck under his left ring fingernail.  He was examined by a physician assistant, Jana Morris.  His past medical history stated "Essential (primary) hypertension . . . (Active)" and the screening indicated that Mr. Winkeljohn was not on any current medications.  His blood pressure reading was 176/100.  The piece of wood was removed, and no medicine was prescribed. Doc. no. 34-3, ECF pp. 5-6.

On December 26, 2017, Mr. Winkeljohn presented himself to Xpress Wellness Urgent Care because of right ear pain.  He was examined by the physician

---

[2] The court notes the medical records indicate a prescription for Amlodipine Besy Benazepril HCL for hypertension with a "Start Date" of February 13, 2015, with a "Status" and "Action" of "Discontinued" on July 27, 2015.  Doc. no. 34-1, ECF p. 4.

assistant, Jana Morris.   His past medical history stated "Essential (primary) hypertension . . . (Active)."   He had two blood pressure readings of 180/120 and 140/100.   The screening indicated that Mr. Winkeljohn was not on any current medications.   He was prescribed Amoxicillin-Pot Clavulanate for his ear condition. Doc. no. 34-3, ECF pp. 8-10.

On July 9, 2018, Mr. Winkeljohn presented himself to Dr. Jerome M. Dilling Jr., an otolaryngologist, complaining of an ear problem on the right side.   His blood pressure reading was 190/116, which was described as "(Abnormal)."   Dr. Dilling believed his pain might be due to temporomandibular joint syndrome.   Mr. Winkeljohn was told to follow up after seeing his dentist.   Doc. no. 34-4.

On January 10, 2019, Mr. Winkeljohn applied online for a preferred non-tobacco 10-year term life insurance policy in the face amount of $500,000 through Assurity's agent, Ethos Technologies Inc. (Ethos).   Prior to Mr. Winklejohn's application, Assurity had relaxed the underwriting requirements for similar policies which were sold by Ethos.   As a result, Mr. Winkeljohn was not required to undergo a paramedical examination, which consisted of height, weight and blood pressure checks and blood and urine sample collections, before obtaining Assurity's approval of insurance coverage.   Instead, he was only required to answer questions set forth in the policy application.

In the "HEALTH SECTION" of the policy application, Mr. Winkeljohn answered "No" to the question of whether during the past 10 years, he had "consulted with or been diagnosed, treated, hospitalized or prescribed medication by a medical professional" for "hypertension (*high blood pressure*)," designated as Question 1a. He also answered "No" to the question of whether during the past 10 years, he had "consulted with or been diagnosed, treated, hospitalized or prescribed medication by a medical professional" for "Sleep apnea," designated as Question 1e.   Further, he answered "No" to the question of whether during the past 5 years, he had been

5

advised to have any "test . . ., treatment, surgery, hospitalization or consultation with a medical professional which has not been completed, or for which results have not been received," designated as Question 3b.  Doc. no. 34-5, ECF p. 26 (emphasis in original).  Mr. Winkeljohn declared that his answers to the questions were "complete and true to the best of my . . . knowledge and belief."  *Id*. at ECF p. 30.

After review of the application, Assurity issued the policy to Mr. Winkeljohn on January 17, 2019.  The policy was reinsured with Munich Re.  Mrs. Winkeljohn was named beneficiary for the policy.  Two weeks later, on January 31, 2019, Mr. Winkeljohn died of "Probable Atherosclerosis Cardiovascular Disease."  Doc. no. 34-6.

Approximately two months later, Mrs. Winkeljohn's attorney sent Assurity a completed "Request for Proceeds Contestable Life Claim" form.  Doc. no. 34-7.  The request was received by Assurity on April 1, 2019.  *Id*. at ECF p. 14.  In the request, Mrs. Winkeljohn indicated that her husband did not have a primary care provider, but she provided the names, addresses and phone numbers of Dr. Barajas, Universal Men's Clinic, Xpress Wellness Urgent Care and Dr. Dilling.  Assurity ordered Mr. Winkeljohn's medical records, beginning in January 2014, from those providers.

On May 23, 2019, Assurity's Senior Medical Review Nurse Cindy Treffer reviewed Mr. Winkeljohn's medical records received and concluded "[t]here are a number of policy application questions which appear to have been answered incorrectly."  Doc. no. 34-9, ECF p. 1.  With respect to Question 1a., Ms. Treffer noted that the medical records reflected that Mr. Winkeljohn was diagnosed with hypertension in 2014 and he had been prescribed medicine for it, but it had been discontinued.  She also noted that blood pressure was addressed by other providers and medication had been prescribed for it, but there was no evidence of follow up as recommended, and other visits indicated he was not taking any current medications.  As to Question 1e., Ms. Treffer noted Mr. Winkeljohn was diagnosed with sleep

apnea in 2009, with some notes indicating he had had surgery for it. She noted that he had not used his CPAP machine despite the recommendation to do so and that a sleep study was ordered in 2014 but it was never completed. Further, she noted Mr. Winkeljohn indicated snoring, daytime sleepiness and fatigue. With respect to Question 3b., Ms. Treffer noted that Mr. Winkeljohn was told to follow up on his blood pressure and get appropriate treatment and to follow up in 3 weeks for a blood pressure check. Doc. no. 34-9, ECF pp. 1-2.

On June 3, 2019, Assurity's Manager of Underwriting Services Joel Zinnecker was asked to review the matter. Assurity's Chief Investigator and Health Claims Manager Monty Styskal told Mr. Zinnecker to answer three questions: (1) if underwriting had been made aware of the medical history they now had, would it have issued the policy as it did; (2) if not, what action would underwriting have taken; and (3) what questions were answered incorrectly on the policy application.

The next day, Mr. Zinnecker answered "No" to the first question, and as to the second question, he advised that underwriting would have declined the application. He then set forth the questions in the "HEALTH SECTION" of the application that were answered incorrectly. He stated that Question 1a. should have been answered yes because Mr. Winkeljohn had been diagnosed with high blood pressure, was prescribed medication, and was "told to follow up but didn't." He said underwriting would have declined for noncompliance with treatment. Mr. Zinnecker also stated that Question 1e. should have been answered yes because Mr. Winkeljohn had been diagnosed with sleep apnea based upon clinical symptoms, but he did not get the recommended sleep study. He stated that underwriting "would have postponed" until the sleep study was completed and results available. With respect to Question 3b., Mr. Zinnecker stated that Mr. Winkeljohn was recommended to have a sleep study that was not done, and "he was told to follow up on his high blood pressure and did not." Doc. no. 34-9, ECF pp. 2-3.

Mr. Styskal determined the policy should be rescinded.  Doc. no. 34-9; doc. no. 34-10, ll. 2-12.  Prior to his decision, Mr. Styskal did not contact Mr. Winkeljohn's health care providers or his wife to find out what information they might have to clarify or explain Mr. Winkeljohn's knowledge or understanding of his health.  Further, Mr. Styskal had reviewed the underwriting file and knew that a paramedical examination was usually an underwriting requirement for Mr. Winkeljohn's policy, but he did not know the reason why underwriting did not require the paramedical examination.  Mr. Styskal was unaware that similar policies sold by Ethos did not require a paramedical examination.

On June 7, 2019, Assurity requested underwriting to provide additional citations from the medical records if there were any.  Bruce Scheiber, Director of Underwriting, provided two blood pressure readings from 2017 (140/100 and 180/120) and one blood pressure reading from 2018 (190/116).  Mr. Scheiber did not note in the file or inform Mr. Styskal that these blood pressure readings would make Mr. Winkeljohn uninsurable or an automatic decline for an insurance policy.

For its review of Mrs. Winkeljohn's claim for benefits, Assurity utilized the medical underwriting guidelines prepared by Munich Re.  According to those guidelines, mild to moderate obstructive sleep apnea (treated or untreated) for someone of Mr. Winkeljohn's age did not result in an increase of the premium rate or a decline or a postponement of the issuance of a policy.  In addition, according to the guidelines, blood pressure readings more than two years old were to be ignored for blood pressure averaging.

In his discovery deposition, Mr. Scheiber testified Assurity had "very scant evidence" of the "degree of hypertension" for Mr. Winkeljohn.  Doc. no. 39-1, ECF p. 17, ll. 4-5, 8-9.  He also testified that he was aware that a person's blood pressure might be fine until that person was in a stressful situation, such as going to the doctor's office or if the individual was in pain.  *Id*. at ECF p. 8, ll. 10-24.  He further

testified that he would be speculating as to what Mr. Winklejohn's average blood pressure would have been, whether it would have been typically lower than the readings he had. *Id*. at ECF p. 17, ll. 17-21.

In a letter dated June 7, 2019, Assurity advised Ethos that it was trying to verify the information received at the time Mr. Winkeljohn applied for the insurance. Assurity asked Ethos to answer certain questions. Ethos responded to those questions on June 11, 2019, stating that it had communicated with Mr. Winkeljohn via email and neither the company nor the individual who communicated with Mr. Winkeljohn were aware of any health conditions not recorded on the application.

On June 13, 2019, Assurity sent a letter, approved by Mr. Styskal, to Mrs. Winkeljohn's attorney advising that it was the company's position the policy was void and liability was limited to all premiums paid. The letter set forth the questions from the application answered "No" by Mr. Winkeljohn and the medical information from Mr. Winkeljohn's records that the company claimed was not disclosed on the application. The letter stated the company considered "this misrepresentation of information material to the acceptance of the risk we assumed by the policy issued to [Mr. Winkeljohn] . . . had the correct information about his prior medical history been disclosed, this policy would not have been issued." The information provided in the letter included two blood pressure readings from 2014, four blood pressure readings from 2017 and one blood pressure reading from 2018. Assurity advised that if Mrs. Winkeljohn disagreed with Assurity's determination, the company should be given a written explanation for the disagreement by July 15, 2019. If nothing was received by July 15, 2019, the company would consider the policy void from inception and all paid premiums would be refunded.

On July 9, 2019, Mrs. Winkeljohn asked Assurity to send her husband's medical records. Assurity mailed those records on July 18, 2019. There was no

further communication from Mrs. Winkeljohn.  Thereafter, Assurity refunded the paid insurance premiums to Mrs. Winkeljohn.

In answers and responses to discovery requests, Mrs. Winkeljohn stated that her husband felt he was in good health.  He regularly checked his blood pressure and felt it was under control and did not need treatment.  In addition, Mrs. Winkeljohn stated her husband had surgery for his sleep apnea condition in December 2008 and he did not believe he had a sleep apnea problem.  Mrs. Winkeljohn was also unaware of any treatment for hypertension or sleep apnea, including whether medication was prescribed.  Doc. no. 39-4, ECF pp. 2, 3.

Assurity was supposed to obtain Munich Re's consent before rescinding an insurance policy.  The company, however, did not request Munich Re's approval of the rescission of Mr. Winkeljohn's policy until approximately two months after the decision to rescind had been made and Mrs. Winkeljohn was notified.  Assurity's representative "hoped they agree[d] with our decision."  Doc. no. 39-2, ECF p. 4, ll. 9-25 and p. 5, ll. 1-13.

## III.

### *Discussion*

#### A. *Breach of Contract*

With respect to Mrs. Winkeljohn's breach of contract claim, Assurity raised the defense of misrepresentations by Mr. Winkeljohn in the application for life insurance.  Assurity maintains that it was entitled to refuse payment of proceeds to Mrs. Winkeljohn and rescind the life insurance policy pursuant to 36 O.S. 2011 § 3609.[3]  "Section 3609 requires a finding of intent to deceive before an insurer can

---

[3] Section 3609 provides in pertinent part:

avoid the policy." Hays v. Jackson National Life Ins. Co., 105 F.3d 583, 588 (10th Cir. 1997). The insurer must prove the insured's intent to deceive by clear and convincing evidence. Scottsdale Ins. Co. v. Tolliver, 261 Fed. Appx. 153, 162 (10th Cir. 2008) (unpublished decision cited as persuasive). The issue of intent to deceive is for the jury where the evidence is conflicting. Scottsdale Ins. Co. v. Tolliver, 127 P.3d 611, 614 (Okla. 2005).

Viewing the evidence and reasonable inferences in Mrs. Winkeljohn's favor and mindful of the heightened evidentiary standard, the court finds no genuine issue of material fact on the issue of intent to deceive. The court finds no conflicting evidence as to whether the answers given by Mr. Winkeljohn were a known falsity to him.

Mr. Winklejohn's medical records establish that within 10 years of his insurance application, he had been diagnosed with and prescribed medication for hypertension. The physician with Universal Men's Clinic in December of 2014 advised Mr. Winkeljohn to make an appointment with his primary care physician to treat his hypertension and prescribed Lisinopril (30-day quantity) to treat it. Mr. Winkeljohn was advised that he could not obtain the intracavernosal injection until his blood pressure was under better control. Approximately two months later, in

---

All statements and descriptions in any application for an insurance policy or in negotiations therefor, by or in behalf of the insured, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent recover under the policy unless:

Fraudulent; or

Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

The insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise.

36 O.S. 2011 § 3609.

early 2015, Mr. Winkeljohn presented to Dr. Barajas for high blood pressure.  In 2017, within two years of his insurance application, Mr. Winkeljohn reported to Xpress Wellness Urgent Care a history of untreated hypertension within systolic blood pressure readings in the range of 150/160.  Although Mr. Winkeljohn had presented to the provider only for an earache, his hypertension was specifically addressed, and he was instructed to follow up in a week for fasting labs and to follow up three weeks for a blood pressure recheck.  He was prescribed Hydrochlorothiazide (30-day quantity) to treat the condition.  Both of his subsequent visits to Xpress Wellness Urgent Care, although for separate issues, showed the history of hypertension and that it was "Active."  Those records also showed he was not taking any current medication.

Although Mrs. Winkeljohn has presented evidence (through her responses to discovery requests) that Mr. Winkeljohn regularly checked his blood pressure, he felt it was under control and did not need treatment (and she was unaware of any treatment), the evidence and the reasonable inferences drawn do not raise a genuine issue of material fact as to whether Mr. Winkeljohn intended to deceive.  The fact that Mr. Winkeljohn regularly checked his blood pressure and he felt it was under control and did not need treatment does not show that he did not know at the time of his application that he had been diagnosed with hypertension and had been prescribed with medication for it within the last 10 years.  The only reasonable inference that can be drawn from the present record is that Mr. Winkeljohn knew his answer to Question 1a. was false.

Mr. Winkeljohn's medical records also show that he had been diagnosed with obstructive sleep apnea in 2014 and Dr. Barajas had addressed the use of a CPAP machine with him at that time.  He reported months later to the physician at Universal Men's Clinic signs of sleep apnea including somnolence and snoring.  He also he reported that his partner said his breathing would stop and that he did not use

12

the CPAP machine.  The physician recommended that Mr. Winkeljohn have a sleep study to evaluate for sleep apnea.  In 2017, within two years of his application, Mr. Winkeljohn reported to the provider at Xpress Wellness Urgent Care his history of surgery to treat sleep apnea and that he still had symptoms of disrupted sleep and not feeling fully rested.  The "Assessment/Plan" included a notation that obstructive sleep apnea and sleep study would be discussed at the next visit.

In her responses to discovery requests, Mrs. Winkeljohn stated that her husband had surgery in 2008, which would be more than 10 years prior to the application.  She also stated that Mr. Winkeljohn did not believe he had a sleep apnea problem.  The court concludes, however, that this evidence and the reasonable inferences drawn do not raise a genuine issue of material fact as to whether Mr. Winkeljohn's intended to deceive.  Even if Mr. Winkeljohn had his sleep apnea surgery outside the 10-year period and did not believe he had a sleep apnea problem, he nonetheless discussed within the 10-year period (on three different visits) signs of the condition and his providers diagnosed him with sleep apnea.  One physician had recommended a sleep study to evaluate the condition and another provider wanted to discuss it with him.  The court concludes on the present record that the only reasonable inference is that Mr. Winkeljohn knew his answer to Question 1e. was false.

Further, the only reasonable inference from the present record is that Mr. Winkeljohn knew his answer to Question 3b was false because within 5 years of his application, he had been recommended to have a sleep study for sleep apnea which had not been completed.

Upon review, the court finds no conflicting evidence on the issue of intent to deceive.[4]   However, in addition to showing an intent to deceive, Assurity must demonstrate that Mr. Winkeljohn's misrepresentations were material to the acceptance of the risk, and that the company would not have issued the policy if the true facts had been known in the application.   Claborn v. Washington National Ins. Co., 910 P.2d 1046, 1049 (Okla. 1996).   Generally, "[t]he materiality of a misrepresentation is a mixed question of law and fact that under most circumstances should be determined by the trier of fact."   Wagnon v. State Farm Fire and Cas. Co., 146 F.3d 764, 768 (10th Cir. 1998).   Materiality, though, "'can be decided as a matter of law if reasonable minds could not differ on the question.'"   Id. (quoting Long v. Insurance Co. of North America, 670 F.2d 930, 934 (10th Cir. 1982) and citing Claborn, 910 P.2d at 1049).   "[A] misrepresentation will be considered material if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented."   Id.

Assurity contends that Mr. Winkeljohn's misrepresentations were material because the company would not have issued the policy as it did if he had revealed his true health history.   The company has presented sufficient evidence through its claim file and deposition testimony to show that it would not have issued the policy as it did if Mr. Winkeljohn had answered the health questions truthfully.

 Mrs. Winkeljohn, however, counters with evidence that Assurity's medical underwriting guidelines do not require that a policy be declined or postponed for mild to moderate sleep apnea.   She emphasizes that Mr. Winkeljohn previously had surgery for his sleep apnea.   Given these facts, Mrs. Winkeljohn contends that her

---

[4] The court notes that Mrs. Winkeljohn's expert opined that "there is no clear and convincing evidence that Mr. Winkeljohn had an intent to deceive [Assurity], as required by insurance industry standards in Oklahoma."  Doc. no. 39-6, ECF p. 8.  The court, by separate order, has excluded the opinion "as not an appropriate subject for expert testimony[.]"  Doc. no. 47, ECF p. 5.

husband's medical records do not conclusively show he was uninsurable due to his sleep apnea condition.

With respect to hypertension, Mrs. Winkeljohn asserts that Assurity's medical underwriting guidelines say to ignore blood pressure readings more than two years old.  Mrs. Winkeljohn contends that evidence shows, however, that Assurity relied upon blood pressure readings more than two years old.  Moreover, she asserts that it shows the company relied upon blood pressure readings taken at visits for acute sinusitis and acute otitis media (earache).  Mrs. Winkeljohn points out that Mr. Scheiber admitted during his deposition that individuals under stress at the doctor's office or in pain may have higher blood pressure than normal.  She also emphasizes that Mr. Scheiber admitted that the company had "very scant evidence" of the "degree" of Mr. Winkeljohn's hypertension, and he did not know what Mr. Winkeljohn's average blood pressure would be and whether it would be typically a lot lower than the readings in the claim file.  Further, she states that Mr. Scheiber admitted the company would issue a policy to an individual of Mr. Winkeljohn's age with high blood pressure, but would "look at the whole picture, not just the blood pressure . . . all their medical history including height and weight, their age, their age, their tobacco use. . . ."  Doc. no. 39, ECF p. 17, citing doc. no. 39-1, ECF p. 48. Mrs. Winkeljohn thus argues that the company relies upon more than old blood pressure readings for underwriting and that the information in the medical records does not show conclusively that her husband was uninsurable based upon hypertension.

Upon review of the evidence in the light most favorable to Mrs. Winkeljohn, the court concludes that reasonable minds could not differ on the issue of whether Assurity would have issued Mr. Winkeljohn's policy as it did if the true facts had been revealed.  The evidence does not raise a genuine issue of material fact on the issue.  And because the record evidence demonstrates that Assurity would not have

issued the policy as it did, the court concludes that record evidence also compels resolution of the issue of materiality in Assurity's favor.

While Assurity's medical underwriting guidelines do not require a decline or postponement of insurance coverage for mild to moderate sleep apnea, the medical records do not reveal the severity of Mr. Winkeljohn's condition. Doc. no. 39-1, ECF p. 54, ll. 22-25. The record evidence shows that had Assurity been aware of the diagnosis of obstructive sleep apnea and the recommended sleep study, the company would have postponed any action on Mr. Winklejohn's application until he had completed the sleep study. *Id*., ECF p. 13, ll. 15-22; ECF p. 14, ll. 7-15, l. 25, ECF p. 15, ll. 1-2; ECF p. 21, ll. 6-14; ECF p. 86, ll. 2-5; Doc. no. 34-9. Thus, because any action on the insurance policy would have been postponed by the company until he completed a sleep study, the insurance policy would not have been issued to Mr. Winkeljohn as it was.

The court rejects Mrs. Winkeljohn's argument about the blood pressure readings. Although blood pressure readings more than two years old were cited by Ms. Treffer in her review of the medical records and by Assurity in the rescission letter, those readings were cited to establish that Mr. Winkeljohn's answer to Question 1a., regarding diagnosis of hypertension, was untrue. As pointed out by Assurity in its reply brief, the company's underwriting analysis is a separate issue. Under the medical underwriting guidelines, readings more than 2 years old cannot be used for blood pressure averaging. The blood pressure readings cited by Mr. Scheiber in the claim file as additional citations from the medical records were within the allowed three-month to two-year timeframe set forth in the guidelines for blood pressure averaging. Doc. no. 34-9; doc. no. 39-1, ECF p. 18, ll. 4-22. Although Mr. Scheiber acknowledged the company had "very scant evidence" of the "degree of hypertension," he nonetheless testified he could only use the "numbers" he had, and those numbers could be used to make an underwriting decision. Doc.

no. 39-1, ECF p. 17, ll. 4-16; doc. no. 42-1, p. 69, ll. 7-18.  He also testified that the three blood pressure readings he cited, along with Mr. Winkeljohn's diagnosis, and the non-compliance with treatment, would have allowed the company to reach a decision not to offer the insurance coverage.  *Id.*, ECF p. 68, ll. 13-16.  In his review, Mr. Zinnecker had noted non-compliance with treatment for hypertension.  The record evidence reflects that under Assurity's guidelines, poor compliance with treatment would have resulted in a higher rating.  Doc. no. 39-1, ECF p. 23, ll. 20-25, ECF 24, ll. 2-4; doc. no. 39-6, ECF p. 10.  The court concludes that Mrs. Winkeljohn's evidence does not raise a triable issue as to whether the company would have issued the policy it did if the true facts had been revealed.  The only reasonable inference from the present record is that the company would not have issued the insurance policy to Mr. Winkeljohn as it did, given his hypertension diagnosis, his relevant blood pressure readings, and his non-compliance with treatment.

Because Mr. Winkeljohn's untrue answers were made with an intent to deceive, were material to the risk and Assurity would not have issued the policy if the true answers had been known, the court concludes that Assurity was entitled to declare the policy void and rescind it under § 3609.  Consequently, the court finds that Mrs. Winkeljohn cannot recover on her breach of contract claim, and Assurity is entitled to summary judgment in its favor on that claim.

### B.  Bad Faith Claim

Under Oklahoma law, an insurer "'has an implied duty to deal fairly and act in good faith with its insured.'"  <u>Sims v. Great American Life Ins. Co.</u>, 469 F.3d 870, 891 (10th Cir. 2006) (quoting <u>Christian v. Am. Home Assurance Co.</u>, 577 P.2d 899, 904 (Okla. 1977)).  "If an insurer fails to fulfill this duty, a bad faith action in tort can arise."  *Id.*

Mrs. Winkeljohn argues that Assurity acted in bad faith by failing to investigate whether her husband intended to deceive the company.  Under Oklahoma law, an insurer, in deciding whether to pay a claim, must "'conduct an investigation reasonably appropriate under the circumstances.'"  Willis v. Midland Risk Ins. Co., 42 F.3d 607, 612 (10th Cir. 1994) (quoting Buzzard v. Farmers Ins. Co., 824 P.2d 1105, 1109 (Okla. 1991)).  "'[A]n inadequate investigation may give rise to a reasonable inference of bad faith by the insurer.'"  Sellman v. AMEX Assur. Co., 274 Fed. Appx. 655, 658 (10th Cir. 2008) (quoting Willis, 42 F.3d at 613).  Crucially, however, "when a bad faith claim is premised on inadequate investigation, the insured must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information."  Timberlake Const. Co. v. U.S.F.&G. Co., 71 F.3d 335, 345 (10th Cir. 1995).  "That is, evidence of inadequate investigation must 'suggest a sham defense or an intentional disregard of uncontrovertible facts' in order to be put to the jury."  Bannister v. State Farm Mut. Auto. Ins. Co., 692 F.3d 1117, 1128 (10th Cir. 2012) (quoting Timberlake, 71 F.3d at 345).  In the case at bar, Mrs. Winkeljohn has failed to proffer evidence sufficient to make the required showing.

Mrs. Winkeljohn points to no material facts that were overlooked by Assurity and submits no evidence that would have affected the outcome of her claim.  She complains that Assurity did not contact her or her husband's physicians to clarify or explain Mr. Winkeljohn's knowledge or understanding of his health.  However, Mrs. Winkeljohn does not proffer any fact that Assurity could have learned from any of Mr. Winkeljohn's physicians or health care providers that would have affected Assurity's decision.  As to herself, Mrs. Winkeljohn stated in discovery requests that her husband regularly checked his blood pressure and that he felt it was under control and did not need treatment.  She also stated that he had surgery for the sleep apnea condition in December 2008, and he did not believe he had a sleep apnea problem.

These facts, however, do not change the underlying facts from the medical records upon which Assurity relied to make its decision. Those records do not show that Mr. Winkeljohn did not know at the time of his application that he had been diagnosed and prescribed medication for hypertension and that he was non-compliant in the treatment of the hypertension. They also do not show that he did not know at the time of application that he had been diagnosed with obstructive sleep apnea based upon the symptoms he reported and recommended to have a sleep study but did not complete it. The medical records demonstrate that Mr. Winkeljohn knew of his diagnosed conditions at the time of his application and those records are evidence upon which Assurity was entitled to rely. Sims, 469 F.3d at 893.

Mrs. Winkeljohn also points to Assurity's rescission letter, claiming that it does not specifically state that the company investigated or determined whether Mr. Winkeljohn intended to deceive. According to Mrs. Winkeljohn, the omission appears to be calculated because the letter asked her to let Assurity know if she disagreed with its determination, but that was difficult to do since it did not tell her intent to deceive was an issue. However, the letter sets out the questions Mr. Winkeljohn was asked to answer in the "HEALTH SECTION" of the application, his answers to those questions, and the specific content of the medical records Assurity contended was contrary to those answers and that Mr. Winkelman had not disclosed. The letter explained that Assurity considered "this misrepresentation of information material to the acceptance of the risk." Doc. no. 34-9, ECF p. 2. Under Oklahoma law, a misrepresentation in insurance application context is "a statement as a fact of something which is untrue, and which the insured states with knowledge that it is untrue and *with an intent to deceive*, or which he states positively as true without knowing it to be true, and which has a tendency to mislead, where such fact in either case is material to the risk." Massachusetts Mut. Life Ins. Co. v. Allen, 416 P.2d 935, 940 (Okla. 1965). The letter was sent to Mrs. Winkeljohn's attorney. The

19

court opines that her attorney understood that the "misrepresentation" finding included a determination of an intent to deceive.    Moreover, where "misrepresentations were made knowingly and deliberately, the intent to deceive the insurer will be implied."  Wagnon, 146 F.3d at 771.  The court concludes that the rescission letter does not support a showing of an inadequate investigation.

Additionally, Mrs. Winkeljohn asserts that Assurity's representatives "were not even sure if they had correctly rescinded the policy because they did not give the required notice of the claim and the rescission investigation to their reinsurer, Munich Re."  Instead, they "just sent notice of the rescission afterward documenting that they were hopeful that the reinsurance company would agree with their rescission."  Doc. no. 39, ECF p. 23.  The court notes, however, that Mr. Styskal, who authorized rescission of policy, was not one of the representatives referenced by Mrs. Winkeljohn.  Doc. no. 39-2, ECF p. 4.  And while Assurity did not seek Munich Re's approval prior to sending the rescission letter to Mrs. Winkeljohn, such failure does not support a finding that Assurity overlooked any material facts or that more relevant information would have been produced.  Indeed, the evidence shows that Munich Re concurred with Assurity's decision.  Doc. no. 42-2.

In her response, Mrs. Winkeljohn also points out that Mr. Styskal admitted that (i) he had reviewed the underwriting file; (ii) there were requirements for "*inter alia*, a blood profile, a paramedical exam, a script check and a urinalysis;" and (iii) he did not know why that information was not in the underwriting file and he did not ask about it.  Doc. no. 39, ECF pp. 19, 20.  Mrs. Winkeljohn contends that Mr. Styskal was unaware of the "accelerated underwriting scheme" for policies sold by Ethos and asserts that "[h]ad a proper rescission investigation been performed, [Assurity] would have learned that it had waived its right to obtain the very information that it used to deny [the] claim."  *Id.*, ECF p. 20.  Mrs. Winkeljohn asserts that the existence of the "accelerated underwriting scheme" and Mr. Styskal's

lack of awareness of its existence is relevant to the adequacy of Assurity's investigation of her claim.  The court disagrees.

Mrs. Winkeljohn has not cited any legal authority to support her assertion that Assurity waived its right to obtain and rely upon Mr. Winkeljohn's medical records in its investigation of Mrs. Winkeljohn's request for proceeds because it did not require Mr. Winkeljohn to undergo the underwriting requirements, such as a paramedical examination.  The recission statute, 36 O.S. § 3609, does not restrict its application to policies where the insured has undergone the insurer's full underwriting requirements prior to issuance of coverage.  And the court notes that Oklahoma law does not require insurers to conduct any investigation prior to issuing policies.  Hays, 105 F.3d at 589; Marshall v. Universal Life Ins. Co., 831 P.2d 651, 653 (Okla. Ct. App. 1991).  Further, waiver, under Oklahoma law, is the voluntary and intentional relinquishment of a known right.  Phillips v. New Hampshire Ins. Co., 263 F.3d 1215, 1220 (10th Cir. 2001).  Mrs. Winkeljohn has failed to proffer sufficient evidence to establish that Assurity voluntarily and intentionally relinquished its right to review Mr. Winkeljohn's medical records and rely upon those records to rescind the policy.  Mrs. Winkeljohn's contention relies upon the opinion of her expert, but the court, by separate order, has determined that the proposed testimony of the expert as to "waiver" will be excluded at trial.  Doc. no. 47, ECF p. 6.  The court finds that the existence of the "accelerated underwriting scheme" and Mr. Styskal's lack of awareness of that scheme does not support a finding of an inadequate investigation by Assurity.  It does not suggest "'a sham defense or an intentional disregard of uncontrovertible facts.'"  Bannister, 692 F.3d at 1128 (quoting Timberlake, 71 F.3d at 345).

In her briefing, Mrs. Winkeljohn asserts that she expects her expert to testify at trial that (i) "customers induced into purchasing life insurance policies that do not properly protect them [] forego the opportunity to seek life insurance policies from

other insurers that are properly underwritten so they are properly protected;" (ii) "it is possible that if Mr. Winkeljohn had been properly underwritten at the time of the application with the appropriate underwriting requirements and appropriate review of medical records, an offer of insurance could have been made on some basis that would have properly protected him and his family;" and (iii) "Mr. Winkeljohn did not have the opportunity to obtain the proper life insurance for himself and his family because he was issued an improperly underwritten preferred rate class life insurance policy by [Assurity] and thought he was protected."  Doc. no. 39, ECF p. 24.  This testimony, however, does not support submission of the bad faith claim to a jury.  It is well-established that the conduct of an insurer "in selling and issuing the policy" does not give rise to a bad faith claim.  Hays, 105 F.3d at 590 (citing Claborn, 910 P.2d at 1051).

Finally, Mrs. Winkeljohn contends that Assurity engaged in improper post-claim underwriting to deny her request for benefits.  Mrs. Winkeljohn asserts that Assurity did not investigate her husband's knowledge and understanding on the health issues.  She also asserts that contrary to its guidelines, the company quoted blood pressure readings from several years back to support rescission.  Mrs. Winkeljohn points out that Mr. Scheiber admitted the company had "very scant evidence" on her husband's blood pressure readings and his normal blood pressure and Mr. Scheiber did not document in the claim file what average blood pressure it determined that he had.  In addition, Mrs. Winkeljohn maintains that the sleep apnea condition was such that under Assurity's guidelines, it probably would not have resulted in a denial of coverage.

Upon review, the court concludes that Mrs. Winkeljohn has failed to present evidence sufficient to show that Assurity engaged in improper post-claim underwriting.  Initially, under the provisions of the policy and Oklahoma law, Assurity was permitted to contest the policy's validity since Mr. Winkeljohn died

within two years of the policy's issuance date.  Doc. no. 34-5, ECF p. 18; 36 O.S. 2011 § 4004.  As previously discussed, Assurity was allowed to rely upon the medical records in its investigation of the claim.  Those medical records showed that Mr. Winkeljohn knew of his hypertension and sleep apnea diagnoses within 10 years from application, had been prescribed medication for the hypertension during that time, he did not comply with treatment for hypertension, and he was recommended to do a sleep study.  Even if the company may have had "very scant evidence" of the "degree" of hypertension, it nonetheless had sufficient evidence that he had the condition, had relevant blood pressure readings showing high blood pressure, which could be used to make an underwriting determination, and he was not complying with treatment.  The record evidence shows that Assurity would not have issued the policy as it did, had it known the information about his hypertension condition.  As to the sleep apnea condition, while the guidelines used by Assurity would not have required a higher premium or denial of coverage for mild to moderate sleep apnea, there was no clear indication in the medical records as to whether Mr. Winkeljohn had mild or moderate sleep apnea.  The medical records did not reveal the severity of the sleep apnea.  Also, the medical records indicated a recommendation for a sleep study to be performed, and the evidence shows Assurity would have postponed issuance of the policy until the results of such test was available.  Since issuance of the policy would have been postponed, the company would not have issued the policy as it did.

Based upon the record evidence, the court concludes that no reasonable jury could that find Assurity's investigation of Mrs. Winkeljohn's request for proceeds was inadequate or unreasonable.  Absent any specific evidence demonstrating that Assurity acted unreasonably or in bad faith, the court concludes that Assurity is entitled to summary judgment in its favor on Mrs. Winklejohn's bad faith claim.

IV.

*Conclusion*

For the reasons stated, the Motion for Summary Judgment, filed by defendant Assurity Life Insurance Company (doc. no. 34), is **GRANTED**.  Judgment shall issue forthwith.

IT IS SO ORDERED this 12th day of October, 2021.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

20-0110p008 rev_.docx